(No. 15671.—Reversed and remanded.)

JOHN RUDIN, Appellant, *vs.* THE KING-RICHARDSON COMPANY *et al.* Appellees.

*Opinion filed February 19, 1924—Rehearing denied April 8, 1924.*

1. SALES—*when title to books is in publishing company—bill of lading.* Where the sole manager of a publishing company is also proprietor of a printing company, an order of the manager for the printing of books by his printing company is a contract for labor and material, and after the books are bound the title to them is in the publishing company until their appropriation to a purchaser; and the fact that in shipping the books the bill of lading is taken out in the name of the printing company as consignor and consignee does not affect the situation.

2. SAME—*when sale of books is a sale of unascertained goods by description.* An order for certain books of a publishing company, where they have not yet been manufactured or printed, is a contract for sale of future or unascertained goods by description.

3. SAME—*form of a bill of lading is not conclusive as to title.* The form in which a bill of lading is taken is indicative of the title to the goods shipped, but it is not always conclusive.

4. SAME—*what is nature of a bill of lading.* A bill of lading, although it may be material in determining the contractual relation of the parties, does not represent the contract between the vendor and vendee, but it is merely a receipt given by the carrier for the goods, coupled with an agreement for their carriage according to the terms expressed in the bill.

5. SAME—*effect where shipper names himself as consignee.* As a general rule, by shipping the goods the seller definitely appropriates them to the contract with the buyer, and in naming himself as consignee in the bill of lading he merely secures himself against the buyer's failure to fulfill his obligation; and the effect of adopting such form of a bill of lading should not be greater than is necessary to accomplish that purpose.

311—33

6. Same—*when shipment constitutes appropriation of goods to buyer.* Where a publishing company has a large number of books printed and bound in compliance with the order of a purchaser and ships them to its own agent as consignee, for the sole purpose of securing performance by the buyer of his obligations under the contract of purchase, (as manifested by the representations of the agent that the books were ready for delivery when the buyer met the seller's demands,) the books are appropriated to the contract and the title to them passes to the buyer.

7. Same—*when buyer may maintain an action for possession of goods.* Although books ordered of a publishing company are shipped to the consignor's agent in part fulfillment of a large order of the purchaser, the latter is entitled to bring an action for possession of the goods shipped by tendering payment for them, and of any balance due on past shipments, at the stipulated price; and he is not required to pay for the entire order before being entitled to possession of the goods shipped.

8. Same—*when buyer makes sufficient demand for possession.* Where books ordered of a publishing company are shipped to the consignor's agent for the sole purpose of securing fulfillment of the contract by the buyer, the buyer, after tendering all he is required to pay under the contract, makes a sufficient demand for delivery of the goods if he demands the bill of lading, and he may begin an action of replevin where the circumstances show that a more specific demand would be unavailing.

9. Same—*when tender by purchaser is unnecessary.* A buyer who is entitled to possession of goods appropriated to the contract of sale need not make a tender of the amount due, where the seller has at all times refused to accept the amount actually due and insisted on payment for other goods ordered but not yet delivered.

10. Carriers—*when goods are not in interstate commerce.* Books ordered of a publishing company and shipped into another State are in interstate commerce only while the shipment is in progress, and where they have arrived at their destination, although they are consigned to the seller and are stored in the carrier's warehouse, they are no longer in interstate commerce.

11. Same—*when section 25 of Warehouse Receipts act does not violate the Federal constitution.* Section 25 of the Warehouse Receipts act of 1907, when applied to the warehouse of an interstate carrier, does not violate section 8 of article 1 of the Federal constitution, authorizing Congress to regulate interstate commerce, where the warehouse in question is used by the carrier for the storage of goods that have arrived at their destination and where the storage therein is not a part of the contract of shipment.

12. SAME—*when warehouse of interstate carrier must comply with act of 1921, regulating storing of personal property.* An interstate carrier which operates a warehouse in Illinois for the storage of goods that have arrived at their destination must comply with the act of 1921, (Laws of 1921, p. 754,) regulating the storing of personal property for hire, where the storage of goods in the warehouse is a transaction separate from the contract of shipment.

13. SAME—*section 25 of Warehouse Receipts act does not preclude proper action in replevin.* Neither section 25 of the Warehouse Receipts act, providing for protection of goods in storage against attachment by garnishment or otherwise, nor section 24 of the Uniform Bills of Lading act, making the same provision with respect to bills of lading, can be applied to preclude the owner of the goods from maintaining an action of replevin to recover the same when they are stored by another who was not authorized to convey title.

CARTWRIGHT and DUNN, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. GEORGE A. SENTEL, Judge, presiding.

WINTERS, PRICE & STEVENS, (GEORGE M. STEVENS, JULIAN C. RISK, and MELVIN L. GRIFFITH, of counsel,) for appellant.

WINSTON, STRAWN & SHAW, (EDWARD W. EVERETT, and GEORGE T. EVANS, of counsel,) for appellees the King-Richardson Company and W. H. Nevins.

GLENNON, CARY, WALKER & MURRAY, (F. W. FLOTT, of counsel,) for appellee the New York Central Railroad Company.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This is an action of replevin brought by John Rudin, appellant, for the recovery of a carload of books shipped by the King-Richardson Company, a corporation, from its warehouse at Springfield, Massachusetts, to itself at Chicago. At the time the action was begun the books were

held by the New York Central Railroad Company in its warehouse. The circuit court of Cook county, which tried the case without a jury, entered judgment against appellant, and he has appealed. The appeal is brought to this court because a constitutional question is involved.

For several years prior to January 1, 1914, appellant was employed by the King-Richardson Company as manager of its Chicago branch. On the date stated these parties entered into an agreement by which appellant became the representative of the company at Chicago for a term of five years, and thereafter he conducted his business under the firm name of "The King-Richardson Company, Chicago Branch." By this agreement the company was to furnish him with its publications at a uniform discount of seventy-five per cent from the retail prices. Appellant agreed to pay all the expenses of the business, including freight, rent, salaries, wages and commissions, to keep an accurate account of the business, to file all correspondence and subscription contracts, to permit the officers of the company to inspect all records and files and to turn the same over to the company at the expiration of the agreement. All the net profits of the business belonged to appellant. January 12, 1916, the parties entered into a supplemental agreement, by which appellant agreed to render monthly statements of collections and disbursements, to retain not to exceed $700 on deposit for the purpose of conducting the business of the branch, and to remit to the company, monthly, the balance of the funds of the branch until appellant's account with the company was discharged. Appellant also agreed to pay to the company, on or before September 1 of each year, whatever remained due the company for business done during the previous year. There had been considerable controversy between the parties regarding payment of accounts and shipments of books, and by this supplemental agreement each party agreed to release the other from claims for damages. Further disagreements

arose, and they entered into a second supplemental agreement September 8, 1917. By this agreement appellant was given the exclusive right to sell the publications of the company in twenty States and certain other specified territory, and he was required to execute a bond to guarantee payment of his account in accordance with the terms of the contract. October 19, 1918, the term of the original contract was extended three years. By this agreement appellant was given the option, upon the expiration of the term, to pay the entire account due, in which event he was to be allowed a discount of two per cent, or to make payments from month to month in accordance with the contract, settling the account in full on or before September 1 following, in which event he was to furnish satisfactory security covering the entire balance due. The company sold all its publications through two branches,—one in Springfield, Massachusetts, and the other in Chicago, Illinois. December 23, 1920, the company entered into an agreement with the proprietors of the two branches to furnish one of its publications, known as "The Bible Story," at a special discount, in consideration of the branches taking between them a total of 20,000 sets. There was a stipulation that if less than 20,000 sets but more than 15,000 sets were taken the price of each set was to be increased fifty cents, and if less than 15,000 sets were taken the price of each set was to be increased one dollar. An additional discount of fifty cents a set was allowed on all sets above 20,000. Other disagreements having arisen in the meantime, it was declared in this agreement that all claims for breach of contract were settled. The term of the previous contracts was extended to December 31, 1922. Appellant agreed to take 14,000 sets of The Bible Story and the Springfield branch agreed to take the remaining 6000 sets. March 25, 1922, appellant ordered from the company 14,000 sets of The Bible Story and listed the number of each binding desired. The company did not make deliveries promptly, as it had agreed,

and appellant was in arrears with his payments. To settle this further controversy between the parties a sixth agreement was executed, by which appellant agreed to make certain substantial payments on his contract and to discharge the balance due by weekly payments, and the company agreed to deliver the books as ordered. Up to December, 1922, the company had delivered but 7701 sets of the 14,000 due appellant. During the nine years covered by the contract and the supplements thereto there were many disagreements, each party charging the other with unfair dealing. These controversies became more bitter during the year 1922, appellant claiming that the company was not delivering the books promptly and the company claiming that appellant was not making his remittances in accordance with the contract. William H. Nevins is president, treasurer, majority stockholder and sole manager of the King-Richardson Company, and he is also sole proprietor of the Springfield Printing and Binding Company. The King-Richardson Company occupied a portion of the fifth floor of the building occupied by the Springfield Printing and Binding Company. The publications of the former were printed by the latter. December 22, 1922, the carload of books in controversy, consisting of 3225 sets of The Bible Story, was shipped from Springfield to Chicago, the bill of lading naming the Springfield Printing and Binding Company as the consignor and consignee. Appellant's place of business was located at 2301 Prairie avenue, Chicago, and the books were shipped to 2300 Prairie avenue, Chicago. Nevins arrived in Chicago on December 26, and thereafter the parties held many conferences but no agreement was reached. January 24, 1923, the books were transferred to the warehouse and a negotiable warehouse receipt was issued to Nevins.

The principal question in this case is whether appellant has title to the carload of books. Appellees contend that the title is in Nevins, the printer. Appellant contends that the title has never been in Nevins but that it was in the

King-Richardson Company until it appropriated the books to the contract and thereby transferred title to him. Appellees contend further that this action of replevin cannot be maintained as long as there is an outstanding negotiable bill of lading or warehouse receipt, until such instrument of bailment is surrendered to the bailor or its negotiation enjoined. Appellant contends that the warehouse receipt is void because the New York Central Railroad Company is operating its Taylor street warehouse in violation of the laws of the State of Illinois, and appellees contend that if the Warehouse act of Illinois is construed to apply to this warehouse it is in contravention of section 8 of article 1 of the Federal constitution, in that it interferes with interstate commerce.

The Bible Story is a copyrighted book and the copyright is owned by the King-Richardson Company, which pays a royalty to the authors. The books are printed from electrotypes and half-tones furnished by this company. As general manager of the publisher, Nevins ordered himself, as proprietor of the Springfield Printing and Binding Company, to print and bind the books in controversy. That this was a contract for labor and material seems too plain for argument. Furthermore, from the time they were taken from the bindery to the time they were placed in the warehouse these books were treated as the property of the King-Richardson Company. Nevins, the printer, had no customer in Chicago, and at no time during the negotiations did he pretend that the books belonged to him. All his representations were that he was holding the books as the representative of the publisher. If he had been holding them in any other capacity there would have been no basis for negotiations with appellant regarding the books, because appellant's relations were with the King-Richardson Company only. After the parties had failed to reach an agreement the freight and other charges were paid by the King-Richardson Company, and Nevins, as treasurer, signed the check.

Before appropriation the title to the books was in the publishing company.

The next question to determine is whether title passed from the company to appellant. This, of course, is a question of intention, and that intention must be ascertained by certain established rules. Rule 4 (1) of section 19 of the Uniform Sales act provides: "Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either before or after the appropriation is made." When the books in controversy were ordered they had not been manufactured, so it was a contract to sell future goods by description. After the books were printed and bound they were in a deliverable state. The question now is, Were they unconditionally appropriated to the contract by the seller? If they were, it was done with the assent of the buyer, because he was demanding the shipment of the books and demanded their delivery to him after the shipment was made. When Nevins ordered this shipment prepared, the shipping clerk of the King-Richardson Company took boxes purchased by the company to the bindery and there packed the books, one set to each box. When the books were packed he stenciled the lids of the boxes with the words, "Books—Keep Dry—The King-Richardson Co., Chicago, Ill." All boxes of books marked in this manner were intended for the Chicago branch, conducted by the appellant. Thereafter these books were hauled to the railroad car and loaded by a drayman employed and paid by the King-Richardson Company. All these acts are exactly those which the company would have performed if it had been shipping to appellant in accordance with the terms of the contract. The only act in-

consistent with the passing of title is the consigning of the books to the Springfield Printing and Binding Company, which is Nevins, who is the sole active officer of the King-Richardson Company. The whole record considered, it is clear that the King-Richardson Company shipped this carload of books to itself, and the fact that it used the trade name of its managing officer does not change the situation.

Section 40 of the Uniform Bills of Lading act provides: "Where goods are shipped by the consignor in accordance with a contract or order for their purchase, the form in which the bill is taken by the consignor shall indicate the transfer or retention of the property or right to the possession of the goods as follows: * * * (b) Where by the bill the goods are deliverable to the seller or to his agent, or to the order of the seller or of his agent, the seller thereby reserves the property in the goods. But if, except for the form of the bill, the property would have passed to the buyer on shipment of the goods, the seller's property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligations under the contract."

The form in which the bill of lading is taken is indicative of the title to the goods shipped, but it is not always conclusive. (*Ammon* v. *Illinois Central Railway Co.* 120 Minn. 438, 139 N. W. 819; *Hamilton* v. *Schlitz Brewing Co.* 129 Iowa, 172, 105 N. W. 438; *Gibbons* v. *Robinson*, 63 Mich. 146, 29 N. W. 533.) The bill of lading is a receipt given by the carrier for the goods, coupled with an agreement for their carriage according to the terms expressed in the bill. It does not represent the contract between the vendor and the vendee. It is, however, sometimes material to consider the bill in determining the contractual relation of the parties. By shipping the goods the seller has lost all use of them and has definitely appropriated them to his bargain with the buyer. Usually it may safely be assumed that the object of the seller in naming

himself as consignee in the bill, thereby reserving the property, is simply to secure himself. If he could be certain that the buyer would fulfill his obligation the natural thing for him to do would be to make a straight consignment to the buyer. The effect of the shipper naming himself as consignee in the bill should not be greater than is necessary to effectuate the purpose of the parties. That these books were consigned to the agent of the King-Richardson Company for the sole purpose of securing performance by appellant of his obligations under the contract is manifested by the representations of Nevins that the books were in Chicago ready for delivery when appellant met his demands. Nevins demanded that appellant pay for all the books that had been delivered, for the carload of books in Chicago and for the carload due under the contract which had not been shipped from Springfield. It is clear that Nevins did not intend to deliver this carload of books until appellant had met his demands, but it is just as clear that he did intend to deliver the books if and when appellant paid the amount demanded by the King-Richardson Company. After giving full consideration to all the evidence in the record and to the exhaustive arguments of counsel, we are convinced that these books were appropriated to the contract and that the title to them passed to appellant. Delivery of possession was not necessary to pass the title. (*Rhea* v. *Riner*, 21 Ill. 526.) It follows that if appellant met his obligations under the contract and was entitled to delivery of possession, and the company refused to turn the books over to him by indorsing the bill of lading or otherwise, then he had the right to maintain an action for the goods themselves. Williston on Sales, sec. 284.

Next we come to the question of right to possession. As we have said, there were repeated disagreements between the parties throughout the nine-year term of their relationship. It is evident that both parties broke the contract on many occasions. Many of these breaches were slight

and would not have justified a rescission by either party. Whether any of them were so substantial and fundamental as to give rise to the right in either party to rescind the contract it is not necessary to decide. Both parties elected to stand on the contract, and each party has at all times insisted on its performance by the other. The company agreed to deliver to appellant 14,000 sets of The Bible Story during 1922, and during the negotiations in Chicago during the closing days of December it insisted that it was ready and willing to fulfill this obligation. Appellant agreed to pay for these books at a stipulated price, but he was under no obligation to pay for them before they were delivered. He agreed to make payments at stated periods from the net profits of his business and to make final settlement of his account at the end of the term. He had the right to settle this account by paying the total balance due, less two per cent, on December 31, 1922, or he could give security guaranteeing the balance due and settle by making payments according to the contract, which would discharge the full obligation on or before September 1, 1923. When the carload of books reached Chicago on December 29 appellant owed the company for books already delivered $61,910.03, and if the carload of books had been delivered to him he would have owed an additional $29,505. The company claimed that he had not kept his agreement to remit to it his weekly balances and refused to deliver the books due on his order until he paid for the full 14,000 sets. This he was clearly under no obligation to do until the sets were delivered. The most that he was obligated to pay was the total amount due for the books already delivered. He was not required to elect how he would settle his account until the last day of December. Daily conferences were held December 27, 28 and 29, and no agreement was reached. On the last day appellant made an offer to perform his part of the contract by giving a surety bond guaranteeing settlement in full of his contract by September 1, 1923, or to

deposit in a bank the full amount of the balance as shown by the company's last statement. On that day he was under obligation to do no more than he offered to do and he was entitled to a delivery of the books. On the same day the company, by a letter signed "The King-Richardson Co., by W. H. Nevins, President and Treasurer," refused the offer of appellant and demanded that he give a bond or make a cash deposit guaranteeing the payment of $123,-928.08 in weekly installments, so that the account would be paid in full on September 1, 1923. If the full 14,000 sets of books had been delivered before this demand was made the demand exceeded by more than $4000 what would then have been due. If the company had delivered to appellant the carload of books in dispute and the 3075 sets due under the contract which had not been shipped from Springfield, the appellant's total obligation to the company would have been $119,463.78. The following day appellant replied to the demand of the company, in effect renewing his offer to guarantee the amount actually due provided the company assured him that it would deliver to him the remainder of the books due under the contract. Negotiations continued until this action was begun, February 20, 1923. During all these negotiations both parties were demanding a performance of the contract. January 10, 1923, the company, in a letter signed "The King-Richardson Co., by W. H. Nevins, President and Treasurer," addressed to appellant, demanded that the latter pay or guarantee "the entire account due from you to the company, which according to our books is $115,608.85, which amount does not include the $4000 held by you under a certain agreement of arbitration dated May 4, 1922," and advising him that "there is in Chicago, ready for delivery to you, 3225 sets of Bible Stories, upon which there is due the company $29,505." In this letter Nevins said that he would be at the offices of his attorney in Chicago until 11 o'clock A. M., January 11, and that he would up to that time "be prepared

to accept a cash payment in full for the amount due from you to the King-Richardson Company and allow you a discount of two per cent." Appellant replied to this demand and offer by a letter dated January 11, 1923, stating, among other things, as follows:

"To forestall objections which you no doubt would make to any security tendered by me, I hereby tender to you certified check in the sum of $85,709.88, covering the following items: My 1922 account, as shown by my books, (which is more than stated by you and handed my attorneys on January 9th,) ............$61,954.06

"Carload of books alleged by Mr. Nevins to be in Chicago ready for delivery and alleged to contain the following sets and bindings:

| | | |
|---|---:|---:|
| 1800 AB ...................................$16,650.00 | | |
| 1100 C (B)................................. | 9,130.00 | |
| 250 A ..................................... | 2,637.50 | |
| 75 AA leather............................. | 1,087.50 | 29,505.00 |
| Total..................................... | | $91,459.06 |
| Less amount withheld by me under terms of arbitration agreement dated May 4, 1922................ | | 4,000.00 |
| | | $87,459.06 |
| Less 2% discount................................ | | 1,749.18 |
| | | $85,709.88 |

"I therefore demand that you give me bill of lading, properly assigned, covering said car of books, showing invoice, stating number of sets and bindings."

By this offer appellant met every demand the company was entitled to make. He offered to pay the company in full for every book delivered to him. He accepted the offer made by the company and tendered payment in full for the amount due, less a discount of two per cent. He demanded the delivery of the books in Chicago by demanding the bill of lading. If the bill had been delivered to him he could not have secured the books from the railroad company without paying or obligating himself for the freight and other charges. After the books were taken on the writ of replevin the King-Richardson Company accepted from appellant $545.03 in payment of freight on the carload of books.

From the time Nevins reached Chicago until this action was begun the company's demands were excessive and it refused at all times to accept the amount actually due from appellant. This conduct of the company relieved appellant from making a tender of the amount due. (*Gorham* v. *Farson,* 119 Ill. 425; *Smith* v. *Lamb,* 26 id. 396; *Witt* v. *Dersham,* 146 Mich. 68, 109 N. W. 25; *House* v. *Alexander,* 105 Ind. 109, 4 N. E. 891.) By insisting upon the delivery of the bill of lading, properly assigned, and by demanding a performance of the contract on the part of the company, appellant, in effect, repeatedly demanded the delivery of the books in question before he began his action of replevin; but if we grant that a specific demand for the books was not made, all the circumstances show that a demand would have been unavailing, and where that is the case a demand is not necessary. (*Kee & Chapell Dairy Co.* v. *Pennsylvania Co.* 291 Ill. 248.) Appellant made a sufficient offer to perform and made a sufficient demand, under the circumstances, to entitle him to the possession of this carload of books, and unless there is some other bar the judgment should have been for him.

After the parties failed to reach an agreement the King-Richardson Company had the New York Central Railroad Company transfer the books in controversy from its railroad car to a warehouse owned and operated by the railroad company under the style of Taylor Street Warehouse. When this transfer was made a warehouse receipt was issued to the "Springfield Printing and Binding Co., W. H. Nevins, Prop'r.," showing that the books had been received in storage and agreeing to deliver the same on payment of charges "to his order." Whether the bill of lading was surrendered at the time this warehouse receipt was issued is uncertain.

The Taylor Street Warehouse has not complied with the provisions of an act regulating the business of storing personal property for hire, (Laws of 1921, p. 754,) and appellees contend that it is not required to secure the license

and give the bond required by this act because it is engaged in interstate commerce. This shipment of books from Massachusetts to Illinois was an interstate shipment, but the transit which constituted the interstate commerce ended when the shipment arrived at its destination. (*General Oil Co.* v. *Crain*, 209 U. S. 211, 28 Sup. Ct. 475; *Gulf, Colorado and Santa Fe Railway Co.* v. *State*, 204 U. S. 403, 27 Sup. Ct. 360.) When this carload of books was stored in the warehouse it had ceased to be an interstate shipment. The railroad company by a new contract received and kept the books in storage and a charge separate and distinct from the charge made for hauling the books was made for storing them. The act applies to the warehouse in question, and this holding does not make it contravene section 8 of article 1 of the Federal constitution.

The view we take of other points in this case makes it unnecessary to decide the contention of appellant that the warehouse receipt issued is, in so far as it is material in this case, void.

Section 25 of the Warehouse Receipts act provides: "If goods are delivered to a warehouseman by the owner or by a person whose act in conveying the title to them to a purchaser in good faith for value would bind the owner, and a negotiable receipt is issued for them, they cannot thereafter, while in the possession of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution, unless the receipt be first surrendered to the warehouseman, or its negotiation enjoined. The warehouseman shall in no case be compelled to deliver up the actual possession of the goods until the receipt is surrendered to him or impounded by the court." (Laws of 1907, p. 481.) Section 24 of the Uniform Bills of Lading act makes the same provision with respect to bills of lading. Since we have decided that appellant was, at the time he sued out his writ of replevin, lawfully entitled to the possession of the books, he was entitled to bring an action to

compel delivery of possession. Neither the King-Richardson Company nor Nevins is a *bona fide* purchaser for value of the goods covered by the warehouse receipt in question, and the warehouseman is not liable to either of them by reason of its delivery of possession under the writ of replevin. This conclusion is supported by the decisions in *Banik* v. *Chicago, Milwaukee and St. Paul Railway Co.* (Minn.) 179 N. W. 899, and *Miller* v. *New York Central Railroad Co.* 200 N. Y. Supp. 287. Furthermore, the statutes requiring the surrender of warehouse receipts or bills of lading or the enjoining of the negotiation of them do not apply to actions of replevin. Replevin is not mentioned in the statutes nor is it similar to the actions that are mentioned. The actions mentioned cover only cases where the plaintiff is a creditor of the owner and seeks to take the goods in satisfaction of a debt, while in replevin the plaintiff claims to be the owner and seeks to recover possession of goods unlawfully withheld. When one seeks to obtain property by attachment, garnishment, execution or other like proceedings, he admits the title is not in himself and seeks to compel an involuntary alienation of the property of another. These statutes expressly limit their application to cases where the owner, or a person who can convey a good title to the property stored to a purchaser in good faith for value, has stored the goods. Therefore the statutes do not apply where, as in this case, the goods are stored by one who is not the owner and who does not have authority to bind the owner in conveying the title. The action of replevin differs in many respects from the actions named in the statutes, and if the legislature had intended that these statutes should include replevin it would undoubtedly have expressly so provided. This court has no authority to read into the statute language which has not been placed there by the legislature.

Appellant was entitled to the possession of the books when he brought his action of replevin. The judgment

denying him possession is therefore reversed and the cause is remanded to the circuit court of Cook county.

*Reversed and remanded.*

CARTWRIGHT and DUNN, JJ., dissenting.