John Rudin, Appellant, v. The King-Richardson
Company et al., Appellees.

Gen. No. 36,802.

Opinion filed June 20, 1934.   Rehearing denied July 9, 1934.

JUDAH, REICHMANN, TRUMBULL & COX and STEVENS,
CARRIER & GRIFFITH, for appellant.

WINSTON, STRAWN & SHAW, for appellees; EDWARD
W. EVERETT and GEORGE T. EVANS, of counsel.

MR. JUSTICE WILSON delivered the opinion of the
court.

On February 20, 1923, the plaintiff, John Rudin,
instituted an action in replevin in the circuit court of

Cook county, for the recovery of a carload of books consisting of 3,225 sets, known as "The Bible Story." The defendants were the King-Richardson Company, a corporation, William H. Nevins, doing business as Springfield Printing and Binding Company, New York Central Railroad Company, a corporation, and John Doe. The books were taken under the replevin writ of the sheriff of Cook county from the warehouse of the defendant railroad company and turned over to the plaintiff. A trial was had before the court without a jury and the issues were against the plaintiff and the right to possession of the books adjudged to be in William H. Nevins, doing business as the Springfield Printing and Binding Company. A writ of *retorno habendo* was ordered to issue and the defendants were awarded their costs. From this judgment plaintiff appealed direct to the Supreme Court of Illinois on the ground that the constitutionality of the Illinois statute regulating the business of storing personal property for hire (Cahill's Ill. Rev. St. 1921, ch. 111a, ¶ 111 *et seq.*) was involved. The Supreme Court on appeal reversed the judgment of the circuit court and remanded the cause. The opinion of the Supreme Court is found in the case reported as *Rudin v. King-Richardson Co.,* 311 Ill. 513. The cause after remandment was again tried in the circuit court, by the court without a jury, resulting in another judgment against the plaintiff and finding the right to possession of the property in the King-Richardson Company, a corporation. From this latter judgment an appeal has been prayed and allowed to this court, and it comes before us for the first time. In the original proceeding in the Supreme Court of this State no mention was made of the constitutional question involved, but the court proceeded to consider the case upon the facts without first transferring it to this court for consideration.

January 2, 1924, after the judgment of the circuit court and before the opinion of the Supreme Court of this State was rendered, Rudin and others filed their bill against the King-Richardson Company and Nevins in the United States District Court of Massachusetts, seeking certain rights as minority stockholders. The court in that case, *Johnson v. King-Richardson Co.*, 28 F. (2d) 192, found against the complainant Rudin and others and dismissed the bill. In its opinion the court found as facts that the bill was brought at the instigation of Rudin who had agreed to bear all of the expenses of the litigation; further, that Rudin for a number of years had been the exclusive agent for the sale of defendant's books in the Chicago territory; that he operated under a written contract and that when the King-Richardson Company proposed to increase the price of these books to Rudin, he objected strenuously and threatened Nevins with legal proceedings; that early in 1922, Rudin conceived the idea of getting up a set of books along the same lines as the King-Richardson Company and of putting them upon the market in place of said company's product; that pursuant to this plan he called for large deliveries of the books from the defendant company in 1922, in an amount more than could be sold, for the purpose of having these on hand to keep the business running until his own books were ready for sale; that Rudin then formulated a systematic plan to ruin the King-Richardson Company in order to prevent it from competing with his new book and employed the authors of the defendant's book to prepare his competing work.

A number of communications from Rudin to others employed by the King-Richardson Company are set forth in the opinion, from which it appears that while Rudin was ostensibly acting as agent for and on behalf of the King-Richardson Company, he was in fact attempting to build an organization for himself. The court in its opinion said:

"Rudin in this case is not even acting for a rival company. He is himself the rival, and is using his position as stockholder to further his own personal business at the expense of the King-Richardson Company. Johnson is a mere stool pigeon of Rudin, having lent himself in his character as stockholder to Rudin." The court also in its opinion held that from the letters of Rudin it is apparent that his purpose in bringing the suit was not to protect the interests of the minority stockholders, but to cause the stock of the King-Richardson Company to become valueless and to put that company out of business.

March 7, 1923, the King-Richardson Company filed its bill of complaint in the United States District Court for the Northern District of Illinois, charging that on January 1, 1914, complainant and the defendant entered into a written contract under which Rudin, the defendant in that case, undertook to manage and conduct plaintiff's business in Chicago, which contract was subsequently modified but otherwise continued in full force and effect. The bill alleges that the terms of the contract have been violated by the defendant and prays for an accounting, injunction and the appointment of a receiver. To this bill the defendant filed his answer and asserted his counterclaim to the effect that there was due him an amount over and above that admitted to be due the complainant because of complainant's failure to carry out the terms of the agreement. The master found in favor of the King-Richardson Company and against the defendant Rudin on his counterclaim and the report was affirmed by the United States District Court. An appeal was taken to the United States Court of Appeals for the Northern District of Illinois, opinion found under the title, *Rudin v. King-Richardson Co.*, 37 F. (2d) 637, where the court, after relating the facts, found that the defendant Rudin under the contract of January 1, 1914, was placed in charge of the Chicago business of the King-

Richardson Company as its agent and that this fact
of agency has at no time been disputed; that books
were shipped from time to time to the Chicago Branch
from the King-Richardson Company and the bank ac-
count carried in that name; that all the contracts with
the employees of the Chicago Branch were made in
the name of the King-Richardson Company, as was
also the lease to the premises; that during the latter
part of 1920, a sharp controversy arose between the
parties with relation to the prices charged for the
books; that Rudin demanded a reduction in price and
threatened suit; that the supplemental agreement of
December 23, 1920, did not terminate the agency of
Rudin, as claimed by him, but was only for the purpose
of adjusting existing conditions; that it was the duty
of Rudin, as agent of the King-Richardson Company,
to exercise good faith in all his dealings with the sub-
ject matter of the agency, but that he, Rudin, violated
his contract in many respects and that the King-
Richardson Company was justified in refusing to de-
liver the books to him under the agreement; that Rudin
borrowed money at the bank, executed the notes of the
King-Richardson Company therefor, and that this con-
duct was not warranted; that Rudin's insistence that
he should not be charged with the amounts represent-
ing the contract price of the sets of books remaining
unsold out of the Springfield carload is without force;
that he had tried to get possession of them from the
King-Richardson Company, but that a delivery to him
of the books would only have furthered the conspiracy
to ruin the business of the King-Richardson Company;
that this company was a publisher and disposed of its
product only through branch offices and was more than
within its rights when it refused to deliver the carload
to Rudin and was not obligated under the law to so
deliver them; that later when the facts were fully
developed from the evidence it appeared that the King-

Richardson Company had neither branch offices nor agents and there was no accessible market for the unsold books. The court found that Rudin was the cause of the damage and ordered the books delivered to the King-Richardson Company; that the various tenders made by Rudin were either insufficient in amount or substance or were procured by notes to which Rudin had unlawfully signed the King-Richardson Company's name and, therefore, the tenders were of no value.

We have cited from these two cases in the United States Court rather fully because of the fact that the holdings in those cases are so diametrically opposed to that of the Supreme Court of this State.

It is the contention of counsel for the defendant, the King-Richardson Company, that these decisions were based upon a number of communications between Rudin and persons other than the defendant, which tended to show that Rudin was not acting in good faith at any time during the negotiations between himself and the King-Richardson Company, but was attempting to destroy the business of the King-Richardson Company for his own purposes, and that this evidence was not before the court upon the original trial of this cause, but that if it had been produced and considered by the Supreme Court on the appeal of the original cause, the judgment would have been favorable to the defendant in the replevin suit in the courts of this State. This testimony was produced upon the second trial of the cause which is now before us on appeal and it is insisted by the defendant that this evidence renders it impossible for the plaintiff to succeed in his replevin suit.

Counsel for the plaintiff in the proceeding here insists that while the cause was reversed and remanded by the Supreme Court, nevertheless, its opinion with the findings therein contained is conclusive against the

defendant and should be the law in the case and that this court should be governed accordingly and reverse this judgment now here on appeal.

On the other hand it is insisted by counsel for defendant that the decision of the United States Circuit Court of Appeals has created an estoppel by verdict which precludes Rudin from contending that he had not breached the contract and that, therefore, the company was justified in refusing to deliver the books.

The opinion of the Supreme Court of this State contains a detailed statement of the facts, but, for the purpose of this proceeding, we believe it is necessary to briefly restate the facts for the purpose of a better consideration of the entire matter.

The King-Richardson Company was a New Jersey corporation, authorized to do business in the State of Illinois. It was the owner of the copyrights and plates of a publication known as "The Bible Story" for which it was obligated to pay royalties to certain authors by the name of Hall and Wood.

In 1922, and for many years prior thereto, one William H. Nevins, who was in control of the King-Richardson Company, by reason of his stockholdings, was also the sole proprietor of the Springfield Printing and Binding Company. Both of these companies had their principal offices in Springfield, Massachusetts, and the employees of the two companies worked interchangeably for both corporations. The books were published by the Springfield Printing and Binding Company for the King-Richardson Company and the King-Richardson Company had two branch offices, one of which was located at Springfield, Massachusetts, and the other at Chicago.

The plaintiff, Rudin, had been employed for some time prior to 1914 by the King-Richardson Company at its Chicago branch and on January 1st of that year he entered into an agreement with the King-Richard-

son Company under which he became manager of the Chicago branch, his income to depend upon the profits of that particular branch of the King-Richardson Company. Books were billed to him at a discount of 75 per cent from the retail price and he was to receive the entire profits from the business after paying for the books, all supplies to be furnished by the company at cost and all expenses including salaries, wages, commissions, freight and rent on the premises. Rudin agreed to devote his entire time and attention to the exclusive business of the company and to do business in the name of the company, whose agent he was, and to pay all expenses of the Chicago branch and to satisfy any and all obligations incurred by him in connection with the business. He was to keep the bank account in the name of ''King-Richardson Company, Chicago Branch.''

Certain controversies arose between Nevins and Rudin, resulting in a supplemental agreement dated January 12, 1916, which settled certain controversies between the parties and provided that the balance due to the King-Richardson Company from Rudin should be paid on or before September 1, 1916. It further provided that all balances due for each year thereafter should be paid in full on or before September 1st of each succeeding year. Further controversies arose between Nevins and Rudin, as a result of Rudin's contention that Nevins was not shipping books promptly and a further supplemental agreement was entered into September 8, 1917, as a result of which Rudin was given exclusive rights to sell the company's publication in further described territory and compromising a dispute over the price of certain books ordered prior to January 1, 1917.

The original agreement expired by its terms on December 31, 1918, and on October 19, 1918, a further supplemental agreement was entered into renewing

all previous agreements for a three-year period from January 1, 1919. This supplemental agreement also provided that Rudin could collect accounts in the name of the company and convert the proceeds to his own benefit, but that the records should be kept in the name of the company and at the termination of the agreement all property should be delivered to the company upon demand.

On January 3, 1920, another supplemental agreement was entered into increasing the price of ''The Bible Story'' and changing the method of billing the books by the company to Rudin from a discount basis to a straight price per set.

During 1920 and thereafter numerous controversies arose between the parties and again a supplemental agreement, which was known as the fifth agreement, was entered into between the parties on the 23rd day of December, 1920. This agreement was between Nevins, personally, the King-Richardson Company, by Nevins, and by Rudin. Under this supplemental agreement the Springfield and Chicago branches agreed to take 20,000 sets of ''The Bible Story'' each year for two years and fixed the price to be paid, the price depending upon the number of books purchased. At this time Rudin was manager of the Chicago branch and Sawhill and Ferris were managers of the Springfield branch of the company.

On March 25, 1922, Rudin placed his order for 14,000 sets and Sawhill and Ferris placed their order for 6,000 sets for the Springfield branch. At this time Nevins was president and the sole managing director of the King-Richardson Company and was also doing business as and controlled the business of the Springfield Printing and Binding Company. During the previous year, 1921, the parties had ordered 20,000 sets in the same manner and at the end of that year, 1921, Rudin was owing the company $114,000 on his 1921

account. A controversy between the parties arose because of the failure of Rudin to pay and Nevins took the position that he would ship books to Rudin only as needed. As a 'result of this controversy on May 4, 1922, a sixth supplemental agreement was entered into between the parties. Under this agreement the company was to continue shipping books and Rudin was to make certain payments on the back account.

In December 1922, 3,225 sets of "The Bible Story," which were a part of the 14,000 sets which Rudin had ordered, were shipped to Chicago and arrived December 29, 1922, and placed on the New York Central 23rd street team track. On January 22nd they were placed in the Taylor street warehouse to be stored for hire. These books were printed by the Springfield Printing and Binding Company, and the Springfield Printing and Binding Company was named as the consignor and they were consigned to Springfield Printing and Binding Company, 2300 Prairie avenue, Chicago, Illinois. On the bill of lading were the words, "see letter attached." At this time the King-Richardson Company's Chicago branch was located at 2301 Prairie avenue. The goods were shipped to 2300 Prairie avenue, which was not the address of the Chicago branch. The letter containing the bill of lading read as follows:

"We are shipping to ourselves today, 2300 Prairie Avenue, Chicago, Illinois, one car of books, . . . which is not to be delivered to any except to our order. When car arrives in Chicago notify consignor at Blackstone Hotel."

This letter was on the stationery of the Springfield Printing and Binding Company and signed by William H. Nevins, proprietor. At this time Rudin was indebted to the King-Richardson Company in the amount of $61,910.03. This was as of December 31, 1922. This was the situation at the time Rudin demanded that

the books in the possession of the New York Central lines be turned over to him under his contract with the King-Richardson Company. The King-Richardson Company objected to turning them over on account of the outstanding indebtedness and insisted upon a substantial payment. January 11, 1923, Rudin by a letter tendered his check in the sum of $85,709.88, covering his indebtedness and certain other items which included the books in transit. This is the tender mentioned in the opinion of the Supreme Court, which will be discussed later, and which is also the tender which the United States Circuit Court of Appeals found from additional evidence to have been based entirely upon the credit of the King-Richardson Company and not upon that of Rudin. This was the situation at the time Rudin instituted this replevin suit to recover possession of the books known as "The Bible Story."

The Supreme Court of this State in its opinion held that it was a question of intention as to whether or not title to the books under the shipment passed to Rudin as the purchaser. As we have already shown in the statement of facts, the books were shipped by the Springfield Printing and Binding Company to the Springfield Printing and Binding Company at Chicago, 2300 Prairie avenue. This was not the address of Rudin or the King-Richardson Company. On the boxes containing the books were stenciled the words: "Books—Keep Dry—The King-Richardson Co., Chicago, Ill." The Supreme Court also says in its opinion, "It is clear that Nevins did not intend to deliver this carload of books until appellant had met his demands, but it is just as clear that he did intend to deliver the books if and when appellant paid the amount demanded by the King-Richardson Company. After giving full consideration to all the evidence in the record and to the exhaustive arguments of counsel,

we are convinced that these books were appropriated to the contract and that the title to them passed to appellant. Delivery of possession was not necessary to pass the title. (*Rhea v. Riner,* 21 Ill. 526.) It follows that if appellant met his obligations under the contract and was entitled to delivery of possession, and the company refused to turn the books over to him by indorsing the bill of lading or otherwise, then he had the right to maintain an action for the goods themselves. Williston on Sales, sec. 284.''

The Supreme Court then in its opinion considers the right to possession and held that the tender on the part of Rudin met the demands of the company and he was entitled to possession. The Supreme Court also held in its opinion as follows:

''From the time Nevins reached Chicago until this action was begun the company's demands were excessive and it refused at all times to accept the amount actually due from appellant. This conduct of the company relieved appellant from making a tender of the amount due.''

Upon the retrial of this cause in the circuit court, all the evidence, records, communications and exhibits introduced in the proceeding in the United States Circuit Court of Appeals and before the District Court of Massachusetts were introduced in evidence under a stipulation of the parties. This evidence is so voluminous that it would be impossible to comment in detail upon the testimony of the various witnesses and the written documents and communications introduced in evidence. But, from a consideration of this testimony and the documentary evidence, we are of the opinion that the views of the Supreme Court of this State might have been different if this evidence had been before that court upon review of the original proceeding in replevin. From this evidence it appears that Rudin in collaboration with Sawhill who was in

charge of the Springfield branch of the King-Richardson Company undertook to destroy the value of the stock of the King-Richardson Company by refusing to make payments for books from time to time and creating controversies which were detrimental to the business; that Rudin had a well defined plan to take over the business of this company in his own name after the expiration of his contract and for that purpose was negotiating with the agents of the company wherever they were located in order to build up for himself a sales organization; that the purpose of acquiring a large number of ''The Bible Story'' books from Nevins was to permit the running of the company until such time as Rudin could supply a new volume for the market; that in order to bring about this plan, Rudin had communicated with the authors of ''The Bible Story'' for the purpose of having them prepare for him a book of similar character as that known as ''The Bible Story'' which he might be able to use and market for his own particular use. We cannot help but feel that Nevins sensed this situation and that in view of the fact of the large amount of money due him from Rudin he was particularly careful in his efforts to keep the property within his own name by consigning it to the Springfield Printing and Binding Company at Chicago and to an address different from that of Rudin. It should be borne in mind that the contract between the King-Richardson Company and Rudin expired December 31, 1922, and a demand for possession of the books and records of the company, together with office equipment, was made January 10, 1923. The replevin suit was not instituted until after this demand for possession by Nevins.

Evidence which was not before the Supreme Court, but introduced upon the trials in the federal court, consisted of communications and the testimony of witnesses to the effect that there was a conspiracy exist-

ing between Rudin, Sawhill and others to effectuate the purpose already stated.

In September, 1922, Rudin and Sawhill were already discussing the exchange of territory records. September 14, 1922, Rudin wrote Sawhill asking him whether he desired a record of sales of ''The Bible Story'' from the Chicago office. Sawhill replied in a communication stating that he would be glad to supply Rudin with the records kept at Springfield, Massachusetts. There is a considerable number of communications along this line, indicating the purpose of acquiring for some reason the territory records of the King-Richardson Company to be used interchangeably.

October 24, 1922, one Orwig, who was connected with the Chicago branch wrote to Sawhill stating that these records were being prepared and that it would be advisable to keep them until everything was settled. During this time Rudin was making an effort to acquire Nevins' stock in the company and in a letter to Sawhill, Rudin said, ''Nevins is going to watch our moves, and will doubtless occasionally in the most unexpected ways and times sound you out.''

On June 27, 1922, Hall wrote Rudin advising him that he had heard of possible changes in the King-Richardson Company, and if Rudin had the capital to invest in a new book it would be preferable to an attempt to imitate an old book. Hall was the author of ''The Bible Story.'' On July 8, 1922, Rudin wrote to Hall telling him that he would be interested in the new book and asking for a conference and later on July 28th he wrote again stating that he would be interested in any work that Hall and Wood were getting out and wished to arrange a conference for August 9th or 10th.

July 22, 1922, Rudin wrote to Sawhill stating, ''We are going to figure on buying enough Bible Story to run us through 1923 the way things look now.''

July 28, 1922, Rudin wrote to Hall suggesting that he attend a conference between himself, Hall and Wood at Springfield. It appears from the record that Rudin paid the expenses of Dr. Hall on July 29, 1922.

Sometime in August, Rudin and Pottenger entered into a contract with Hall and Wood for the preparation of a new book. Later Hall wrote Rudin asking him to put the contracts in his safe and not to refer to them in any way to Nevins. In August, Hall spent several days in Chicago with Rudin discussing the question of getting out the new work. On August 28th, Rudin wrote to Sawhill telling him that he had broken his promise not to tell Hall that Sawhill and Ferris would not be in the new combination.

A number of communications of similar import passed between the parties, showing that prior to the beginning of the replevin suit and before the expiration of Rudin's contract, he had been negotiating with Hall, Wood and Sawhill in order to procure a new story that would take the place of the one produced by the King-Richardson Company. During this time, moreover, Rudin was in communication with his brother, a lawyer, who was helping to formulate the plan to secure the business of the King-Richardson Company for Rudin.

In October, 1922, Rudin wrote Hall a letter, as follows:

" 'I am enclosing herewith an opinion by my brother on your and Professor Wood's contract which, in substance, holds that the contract which you made with Mr. King originally, to which, of course, the King-Richardson Company succeeded by assignment from him, is purely a printing and selling right; that you and Professor Wood retain your rights as authors, and that you can by notice to the King-Richardson Company terminate as to their right to further print and sell The Bible Story at any time.

" 'I also enclose a copy of your original contract as it was delivered to me some years ago, by either Mr. Nevins or Mr. Johnson. I wish you would submit this to your attorney, together with my brother's opinion, and if he agrees with you, of course, you can absolutely block Mr. Nevins' sale of his interests with the King-Richardson Company, because, as you know, the only value is in the right of *The Bible Story.* Further, if that is the situation, we can be saved a tremendous lot of work in the building of our new set. We have a right to use any portion of it, and to prevent the further sale of *Bible Story,* thus eliminating it as a competitor, and eliminating the King-Richardson Company as well, because it will have nothing to exist for, as no one will buy out the stock without the right to sell, and publish and to own, *The Bible Story.* At least it will give you control of the situation and enable you to say to whom *Bible Story* shall be sold, or to say that it shall not be sold at all after the new work is out.

" 'Kindly let me hear from you on this.' "

On October 28, 1922, again Rudin wrote to Hall asking him whether or not his lawyer's opinion agreed with that of Rudin's brother and whether he could not by notice terminate the rights of the King-Richardson Company to further print or sell "The Bible Story"; that if he could he could then use any part of "The Bible Story" in the new work and could absolutely block any sale of Nevins of his stock and get it nearly at his own figure. In this communication he adds,

" 'I know the effect that would have upon Mr. Nevins' stock, and upon the value of K-R Company; practically reducing that to zero! I would be affected along with other K-R stockholders, but I would willingly sacrifice whatever I have to go on with the new work and to leave our future unhampered and unharassed! I don't want you to take any action, of

course, that will mean any loss to you and Professor Wood on the old set. I simply ask that you do not put into Mr. Nevins' hands, or to any successor to him, the power to hamper us.' ''

It must be borne in mind, considering this communication, that Rudin was the agent of the King-Richardson Company in charge of the Chicago branch and by law obligated to a faithful performance as such and to work for the best interests of his employer. The correspondence introduced in evidence in our opinion shows a total disregard of this obligation and instead shows a determined purpose on the part of Rudin to destroy the value of the King-Richardson Company stock and to succeed to its business. Rudin did not own the Chicago branch, but was simply a stockholder. He does not deny this, but by his conduct in the Massachusetts court as such, openly recognized his position as a minority stockholder in charge of the business in Chicago, as its agent. His intention of taking the books under the consignment to Chicago is illustrated by his communications of September 21, 1922, September 23, 1922, and September 27, 1922, in which communications to Sawhill it appears that although he had placed an order for 14,000 sets for the year, he did not feel that he was obligated to take them and that if he did not want them he was sure he could not be compelled to do so; that he might have to disappoint Nevins as it looked as if he might be able to get along with 2,000 or 3,000 sets. In this communication of September 23, 1922, he stated: ''Think it's well for us to go on record on it, because if he tries to act nasty in the final settlement of our account we can come back against him for defective workmanship.''

It also appears from the evidence, as shown by the books of the King-Richardson Company, that Rudin, for his own benefit, had been making new contracts

with the agents of that company before their old contracts with the King-Richardson Company had expired. The King-Richardson Company contract having been terminated with Rudin, he should not have made any contracts with agents of that company after that date. A number of contracts were, however, so made. After termination of the contract the business in the Chicago branch was conducted without interruption and new contracts were made in the name of that company by Rudin and his associates. The advertisements in the papers for agents in the company's name and letters were signed by Rudin stating that he was formerly of the King-Richardson Company of Chicago. A number of agents were secured for the sale of the "Book of Life." This was the publication which Rudin intended to substitute for "The Bible Story" and which was a result of the plan devised by Rudin, Sawhill and Hall.

The lease to the premises of the King-Richardson Company was, of course, in the name of that corporation and it was the understanding between the parties that it was so to remain as shown by the correspondence. November 27, 1920, however, Rudin procured a lease to the premises in his own name as lessee. This lease provided that—meaning Rudin—"you are to have the space that is now occupied by the King-Richardson Company." This lease was accepted by John Rudin. This lease ran beyond the termination of his employment with the King-Richardson Company.

The evidence set out in this opinion, together with a great number of documents and writings, was not before the Supreme Court at the time of its decision and, therefore, that court was not advised as to the actual situation between the parties. From this new evidence introduced upon the second hearing it is apparent that Rudin had already breached the contract

by taking the lease to the premises in his own name, soliciting the agents of the company for his own purposes for future employment after the termination of his contract and by his conduct in attempting to destroy the business of the King-Richardson Company. When the Supreme Court in its opinion held that the books were appropriated to the contract, it did not have before it this evidence. As we have already stated, Nevins must have sensed something of this situation when he attempted to keep control of the books by having them assigned to the Springfield Printing and Binding Company of Chicago at an address different than that of Rudin. In our opinion the new facts in evidence justified him in his position in refusing to deliver and have a direct bearing upon the intention of the parties.

The Supreme Court in its opinion referred to the fact that Rudin had made a sufficient offer to perform and a sufficient tender to entitle him to possession of the books. From the new evidence adduced upon the trial of the other proceeding since that opinion, it developed that $45,000, which went to make up part of the certificate of deposit, the certified check used in making the tender to the defendant, was made up of a note for $45,000, payable to the order of the bank, signed the King-Richardson Company, by John Rudin, manager. It is evident from this that the purported tender was based largely upon the credit of the King-Richardson Company, of which Nevins was the principal stockholder, and which would have sustained the principal loss in case of its nonpayment if the tender had been accepted. This evidence was not before the Supreme Court and it had no means of ascertaining the fact from the record as it was then before it. It amounted to a tender to the defendant of his own money.

In the case of *Rudin v. King-Richardson Co.*, 37 F. (2d) 637, the Circuit Court of Appeals for the Northern District of Illinois, in referring to this particular transaction, found that the tenders were insufficient and in its opinion it says: "They were either insufficient in amount or substance, or the principal amounts of such tenders were procured by notes to which appellant had unlawfully signed appellee's name."

Rudin, as agent, did not have the power to borrow money in the corporate name and particularly for his own purposes. There was nothing before the Supreme Court of this State indicating that Rudin had included in his tender a large amount which went to make up the total which was, in fact, based upon the credit of the corporation.

From a consideration of all the newly produced evidence in regard to the relationship existing between the parties and the new evidence as to the purported tender, we are of the opinion that the judgment of the circuit court is correct. The decision of the Supreme Court was not based upon the law of the case, but upon the facts. Under such circumstances when the cause was remanded, it naturally follows that the cause must be retried. If it should develop on the new trial that additional evidence was heard which would materially alter the rights of the parties in the opinion of the trial court, it becomes the duty of such trial court to consider this new evidence together with all the other evidence in the case.

We agree with counsel for plaintiff that the trial court is bound by the law of the case as found by a court of review upon appeal, but this rule is not applicable to cases depending entirely upon the question of fact. As already stated, this cause was not heard by us on the facts on appeal from the previous judgment and, as only a question of fact is involved, we are constrained to impose our finding on such facts

as they appear. We are of the opinion that these facts have thrown an additional light upon the entire subject matter and that the judgment of the trial court should be affirmed, and, for that reason, it is affirmed.

*Judgment affirmed.*

HALL, P. J., and HEBEL, J., concur.